# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

COUSINS SUBMARINES, INC. and
COUSINS SUBS SYSTEMS, INC.,

                       Plaintiffs,

v.

FEDERAL INSURANCE COMPANY,

                       Defendant.

Case No. 12-CV-387-JPS

ORDER

       The plaintiffs, Cousins Submarines, Inc., and Cousins Subs Systems, Inc. (collectively, "Cousins"), initially filed this suit on March 19, 2012, in Waukesha County Circuit Court. (Docket #1, Ex. A). The defendant, Federal Insurance Company ("Federal"), removed the case to this Court on April 27, 2012, pursuant to 28 U.S.C. §§ 1332(a) and 1441. (Docket #1). In this suit, which stems from Federal's refusal to cover a settlement reached by Cousins in a prior franchise dispute, Cousins seeks compensatory and declaratory relief against Federal. (*See* Docket #1, Ex. A).

       On December 18, 2012, the parties filed cross-motions for summary judgment. (Docket #22, #30).[1] The summary judgment motions are now fully briefed, and the Court may address them. (Docket #23, #34, #37, #41, #53, #54). In doing so, the Court will first set forth the background of the case, after which it will discuss the summary judgment standard and general law

---

[1]Federal filed additional motions seeking to exclude the testimony of Cousins' proffered expert (Docket #46) and another Cousins witness, Frederic Cohen (Docket #50). The parties have not yet fully briefed these motions, but the Court will nonetheless decide them at this time, in an effort to expeditiously issue this order, as the Court discusses further, below.

applicable to this case, before turning to the more substantive issues that it must decide.

1. BACKGROUND

This matter's background is rather intricate. There are multiple individuals and businesses involved; there are a number of contracts between those entities; and there was a prior action in federal court, which made it all the way to the summary judgment stage before being settled. Therefore, the Court sets forth the facts of this matter in the most distilled way possible, with brief subsection headings intended to provide an overview of the most relevant facts underlying this suit.[2]

The primary parties involved at this juncture are Federal and Cousins. Federal is an insurance provider. Cousins, of course, is a chain of sandwich shops, with franchise locations across the country.

1.1 Insurance Contract Between Federal and Cousins

In connection with its operations, Cousins acquired an insurance policy through Federal for the period November 1, 2008, through November 1, 2009. (SF ¶ 1).[3] As a part of that policy, Cousins purchased Corporate Liability Coverage, which supplements the standard Directors & Officers Liability Coverage. (SF ¶¶ 2, 4; Policy (Docket #35, Ex. A), Directors & Officers Liability Coverage Section, at 1–2). The Directors & Officers portion

_____

[2] The Court acknowledges that it has left out many of the details of Cousins' actions leading to the prior action and details of the prior action, itself. While those details are somewhat important, they also distract from the true crux of the issues now before the Court. The Court has, accordingly, left many of those details out of its condensed version of the facts.

[3] For purposes of this Order, the Court will use "SF" to designate the parties' stipulations of fact (Docket #35). Similarly, "CF" will be used to designate Cousins' proposed facts (Docket #33), while "FF" will designate Federal's proposed facts (Docket #24).

provides coverage for "wrongful acts" committed by Cousins' individual directors and officers, whereas the Corporate portion covers any "wrongful acts" committed by Cousins, itself, as an entity.[4] (Policy, Directors & Officers Liability Coverage Section, at 2, subpts. I.B and I.C).

### 1.2    Cousins' Underlying Wrongful Acts

Indeed, that coverage was wisely purchased, as Cousins engaged in activities qualifying as wrongful acts during and before the period of coverage, requiring it to call upon that coverage. In short, Cousins and a number of its representatives enticed—through arguably illegal means—a group of investors to open Cousins franchises in Indiana. *See Cousins Subs Systems v. Better Subs Development, Inc., et al.*, No. 09-CV-336-CNC, Docket #94, at 2–8.

### 1.3    Prior Action, *Cousins Sub Systems v. Better Subs Development, Inc., et al.*

That franchise deal fell through, prompting Cousins to file suit against the investors in the Eastern District of Wisconsin, which was assigned to Judge Charles Clevert. *See Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #1. The investors quickly filed twelve counterclaims against Cousins and its representatives. *See Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #9.

Shortly thereafter, on August 31, 2009, Federal wrote a letter to Cousins, informing Cousins that Federal would not provide coverage for any award against Cousins stemming from those counterclaims. (SF ¶ 10; Letter, 8/31/09 (Docket #35, Ex. D)). In that letter, Federal stated that it viewed the

---

[4] As will be discussed later in this order, the parties do not dispute the fact that Cousins' actions constitute wrongful acts. (CF ¶ 1; Federal Resp. CF ¶ 1). Therefore, the Court need not provide the definition of wrongful acts, as provided in the policy.

losses as being excluded from coverage under Exclusions (C)(2) and (C)(8)[5] of the insurance policy. (Letter, 8/31/09, at 3–4). Put simply, Federal argued—and continues to maintain this position in the matter at hand[6]—that Cousins' activities all resulted from contracts or unfair trade practices, and are thus excluded from coverage by Exclusions (C)(2) and (C)(8), respectively. (Letter, 8/31/09, at 3–4). Despite declining to cover any losses,

---

[5] Exclusions (C)(2) and (C)(8) form the heart of the dispute in this matter, and the Court will discuss them extensively in the analysis section of this order. Nonetheless, it is worth setting the terms of those exclusions at this point, for context. Those exclusions provide that "[n]o coverage will be available under Insuring Clause (C) [the additional Corporate Liability Coverage purchased by Cousins] for any Insured Organization Claim…"

> (2)     based upon, arising from, or in consequence of any actual or alleged liability of an Insured Organization under any written or oral contract or agreement, provided that this Exclusion (C)(2) shall not apply to the extent that an Insured Organization would have been liable in the absence of a contract or agreement;
>
> . . .
>
> (8)     based upon, arising from, or in consequence of allegations of price fixing, restraint of trade, monopolization, unfair trade practices or any actual or alleged violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world.

(Policy, Directors & Officers Liability Coverage Section, at 8–9, subpts. III.C.2 and III.C.8) (bolding removed).

[6] In fact, Federal sent Cousins a letter reasserting its denial of coverage on February 13, 2012—mere weeks before the scheduled trial date and the matter's ultimate settlement.

Federal agreed to pay for some of the defense costs under a separate clause of Cousins' policy, as the prior action, including the counterclaims against Cousins, progressed. (Letter, 8/31/09, at 4).

The action did, indeed, progress, and on September 30, 2011, Judge Clevert issued a summary judgment opinion. *Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #94. Following Judge Clevert's opinion, Cousins' initial claims against the investors remained; more importantly, though, Judge Clevert declined to grant summary judgment on six of the investors' counterclaims, specifically the following:

    (1)     intentional misrepresentation;

    (2)     breach of two contracts between Cousins and the investors;

    (3)     rescission of those contracts;

    (4)     violation of the Wisconsin Franchise Investment Law, Wis. Stat. §§ 553.41(3–5) and 553.51;

    (5)     violation of the Wisconsin Theft statute, Wis. Stat. §§ 943.20(1)(d), 895.446; and

    (6)     violation of the Indiana Franchise Disclosure Act and Deceptive Trade Practices Act, In. Code §§ 23-2-2.5-1; 23-2-2.7-1(10); and 23-2-2.5-27, 28, 29, and 31.

*Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #94, at 10–27; (FF ¶¶ 47–50; Cousins Resp. FF ¶¶ 47–50).

Several of Cousins' and the investors' claims remaining, the litigation in the prior action continued onward. Federal continued to provide defense costs to Cousins after the issuance of that opinion, but persisted in asserting its denial of coverage for any losses. (FF ¶¶ 68, 70–73; Cousins Resp. FF ¶¶ 68, 70–73). Federal offered to contribute $20,000 to a potential

settlement, but declined to offer any additional coverage. (FF ¶ 66; Cousins Resp. FF ¶ 66).

### 1.4 Cousins' Unilateral Settlement With Investors

Despite Federal's continued opposition to coverage, Cousins unilaterally decided to settle the remaining claims on the eve of trial. (CF ¶¶ 15, 16, 17; Federal Resp. CF ¶¶ 15, 16, 17; FF ¶¶ 75, 76, 77; Cousins Resp. FF ¶¶ 75, 76, 77). That settlement required Cousins to dismiss its claims against the investors and further to pay $750,000 to the investors, in exchange for dismissal of the six counterclaims remaining against Cousins. (FF ¶ 76; Cousins Resp. FF ¶ 76; CF ¶ 16; Federal Resp. CF ¶ 16). Cousins paid the full $750,000 using its own funds, without any contribution from Federal. (CF ¶ 17, 18; Federal Resp. CF ¶ 17, 18).

### 1.5 Cousins' Filing of the Suit at Hand

Thereafter, having funded the settlement on its own, Cousins brought the suit at hand in Waukesha County Circuit Court. (Docket #1). In it, Cousins alleges that Federal breached its insurance contract with Cousins by denying coverage, and accordingly Cousins seeks damages for breach of contract and bad faith, as well as a declaratory judgment that Federal breached its obligations under the contract. (Compl. ¶¶ 21–38).

Federal removed the case to this Court on diversity grounds, and—the parties' mediation having been unsuccessful—the Court has before it the parties' cross-motions for summary judgment. Those motions are now fully briefed, and the matter is ripe for review.

## 2. SUMMARY JUDGMENT STANDARD

The parties do not dispute any of the above-discussed factual background, and also agree that Cousins' underlying conduct toward the investors qualifies as a wrongful act for purposes of the policy; thus, Federal

would be required to cover any losses resulting from that conduct unless an exclusion were to apply. (CF ¶ 1; Federal Resp. CF ¶ 1). And that is the broad legal issue, here: whether either Exclusion (C)(2) or (C)(8) applies to Cousins' conduct such that it bars Federal's coverage of Cousins' resulting losses.

With the parties in agreement on the entirety of the material facts, the Court may appropriately evaluate that legal issue at this summary judgment stage. *See, e.g.*, Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574 (1986).

3.      APPLICABLE LAW

The Court's analysis will be governed by Wisconsin law, given that the policy was issued in the state of Wisconsin, to Cousins (a Wisconsin corporation), and with litigation in the prior action having taken place in the Eastern District of Wisconsin. *See, e.g.*, *Sentry Ins. Co. v. Novelty Inc.*, No. 09-CV-355-SLC, 2009 WL 5087688, at *4–*5 (W.D. Wis. Dec. 17, 2009); *Love v. Blue Cross & Blue Shield of Georgia, Inc.*, 439 F. Supp. 2d 891, 892–93 (E.D. Wis. 2006); *State Farm Mut. Auto Ins. Co v. Gillette*, 2002 WI 31 ¶ 26, 251 Wis. 2d 561, 641 N.W.2d 662; *see also Heil Co. v. Hartford Accident & Indem. Co.*, 937 F. Supp. 1355, 1360 (E.D. Wis. 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

Under Wisconsin law, the interpretation of an insurance policy is appropriately decided at the summary judgment phase of litigation. *Rhein Bldg. Co. v. Gehrt*, 21 F. Supp. 2d 896, 899 (E.D. Wis. 1998); *Heil Co.*, 937 F. Supp. at 1360–61 (citing *United States Fire Ins. Co. v. Good Humor Corp.*, 173 Wis. 2d 804, 819, 496 N.W.2d 730, 735 (Ct. App. 1993); *Raby v. Moe*, 153 Wis.2d 101, 109, 450 N.W.2d 452, 454 (1990)); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65. The

Court must first interpret the policy's plain language, giving the policy's words their common and ordinary meaning as would be understood by a reasonable person in the position of the insured. *Froedtert Memorial Lutheran Hospital, Inc. v. National States Ins. Co.*, 2009 WI 33, ¶ 41, 317 Wis.2d 54, 765 N.W.2d 251; *American Girl, Inc.*, 2004 WI 2, at ¶ 23; *Society Ins. v. Capitol Indem. Corp.*, 2003 WI App 61, ¶ 8, 260 Wis.2d 549, 659 N.W.2d 875; *Nelson v. McLaughlin*, 211 Wis. 2d 487. 497, 565 N.W.2d 123 (1997); *General Cas. Co. of Wis. v. Hills*, 209 Wis. 2d 167, 175, 561 N.W.2d 718 (1997); *Kremers-Urban Co. v. American Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156, 163 (1984). The Court need not apply rules of construction to the policy unless it determines that the plain language of the policy is ambiguous; in such case, it must construe the terms of the policy against the insurer, particularly in the case of policy exclusions. *Folkman v. Quamme*, 2003 WI 116, ¶ 13, 264 Wis. 2d 617, 665 N.W.2d 857; *Smith v. Atlantic Mut. Ins. Co.*, 155 Wis. 2d 808, 811, 456 N.W.2d 597 (1990); *Kaun v. Indus. Fire & Cas. Ins. Co.*, 148 Wis. 2d 662, 669, 436 N.W.2d 321 (1989).

4.     DISCUSSION OF SUBSTANTIVE ISSUES

Having determined that summary judgment is appropriate, and having set forth the general Wisconsin law that will control the Court's interpretation of the dispute of policy provisions, the Court now turns to the substantive legal issues in the case. As mentioned above, there is a single, broad issue in this case: whether either Exclusion (C)(2) or Exclusion (C)(8) excludes Cousins' claims from coverage under the policy. That broad issue breaks down into two separate subparts (as to each Exclusion), which both also entail the resolution of various other issues.

Case 2:12-cv-00387-JPS   Filed 02/08/13   Page 8 of 34   Document 58

There are also two additional issues that the parties have raised in their summary judgment briefs and that the Court must address: whether the Court should grant Federal's motion for summary judgment on the issue of bad faith; and whether Federal has met its burden to show that a portion of Cousins' settlement should be allocated to non-covered claims.

Finally, Federal has filed two additional motions that the Court will also address in this order: a motion to exclude the proffered testimony of Cousins' expert witness, Daniel Doucette (Docket #46); and a motion to strike the affidavit of Frederic Cohen (Docket #50). The motion to strike Mr. Doucette's testimony relates to the issue of bad faith, whereas the motion to strike Mr. Cohen's affidavit relates to the issue of apportionment of the settlement to the counterclaims. The Court will discuss each of those motions with respect to the broad issue to which they relate: bad faith and apportionment, respectively.

### 4.1    Exclusion (C)(2)

The Court's analysis of Exclusion (C)(2) must first begin with its interpretation of the language of that Exclusion. After interpreting Exclusion (C)(2), the Court must apply its interpretation to each of the counterclaims remaining after Judge Clevert's summary judgment opinion in order to determine whether any or all of the settlement is excluded from coverage.[7]

---

[7] The Court having already determined, by virtue of the parties' agreement (CF ¶ 1; Federal Resp. CF ¶ 1), that Cousins' underlying activities constitute wrongful activities under the policy, the Court would be obliged thereunder to find that the settlement is a loss covered by the policy, in the absence of some exclusion. Therefore, the Court must examine Exclusion (C)(2) (as well as Exclusion (C)(8), later in its order) to determine whether it applies to each of the counterclaims remaining after the issuance of Judge Clevert's summary judgment opinion, as the settlement was made in exchange for dismissal of those remaining claims.

Case 2:12-cv-00387-JPS   Filed 02/08/13   Page 9 of 34   Document 58

### 4.1.1   Interpretation of Exclusion (C)(2)

Exclusion (C)(2) provides that "[n]o coverage will be available under Insuring Clause (C) for any Insured Organization Claim"

> (2)    based upon, arising from, or in consequence of any actual or alleged liability of an Insured Organization under any written or oral contract or agreement, providing that this Exclusion (C)(2) shall not apply to the extent that an Insured Organization would have been liable in the absence of the contract or agreement.

(Policy, Directors & Officers Liability Coverage Section, at 8, subpt. III.C.2) (bolding removed).

To begin its analysis of this language, the Court finds that the language of Exclusion (C)(2) is not ambiguous—its meaning is clear on its plain terms. And, distilling those plain terms, the Court can formulate the following essential statement of coverage: no coverage is available for any claim arising from any actual or alleged liability under any contract or agreement, unless the insured would have been liable even if the contract did not exist. This distillation can be broken down even further into two questions, which the Court will apply to each of the claims remaining at the time that Cousins settled with the investors in the prior action.

*First*, the Court should determine whether the claim arose from liability under a contract. In essence, this requires the Court to determine whether Cousins' settlement liability was under its contract with the

Case 2:12-cv-00387-JPS   Filed 02/08/13   Page 10 of 34   Document 58

investors.[8] If the Court answers that question "No," finding that the claim did not arise from liability under a contract, then Federal must cover Cousins' claimed losses. If, on the other hand, the Court answers that question "Yes," then Cousins' claimed losses are excluded from coverage, unless the Court answers the second question in the affirmative, as discussed below.

Naturally, Federal argues that Exclusion (C)(2)'s "liability under" provision applies very broadly, excluding any claims for liability that would not lie "but for" the existence of an underlying contract or agreement. (*See, e.g.*, Federal Br. in Supp. 8–10 (citing *Federal Ins. Co. v. KDW Restructuring and Liquidation Servs.*, --- F. Supp. 2d ----, 2012 WL 3579840 (M.D. Pa. Aug. 17, 2012); *Spirtas Co. v. Federal Ins. Co.*, 481 F. Supp. 2d 993 (E.D. Mos. 2007), *aff'd* 521 F.3d 833 (8th Cir. 2008); *Martinez v. Calimlin*, 739 F. Supp. 2d 1142, 1145 (E.D. Wis. 2010); *Curtis-Universal Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994); *Krueger Int'l, Inc. v. Fed. Ins. Co.*, 647 F. Supp. 2d 1024, 1031 (E.D. Wis. 2009); *Amec Constructions Mgmt., Inc. v. Regent Ins. Co.*, No. 03-CV-2880, 2004 WL 816720, at \*4 (N.D. Ill. Mar. 12, 2004); *Williamson v. Cont'l Cas. Co.*, 492 A.2d 1028 (N.J. Super. Ct. 1985)). *See also* Federal Resp. 5–10; Federal Reply 3–6).

---

[8] This first questions, in an of itself, is practically a two-prong analysis. First, it would need to be determined whether the liability was under a contract. Second, it would need to be determined whether the claim, itself, arose from that liability. However, given that the parties do not dispute the origin of the claim—that is, they agree that the claim stemmed from Cousins' settlement liability—the only relevant question is whether the settlement liability was under a contract.

The parties seem to generally agree that Exclusion (C)(2) applies to exclude claims stemming from liability under a contract. (Federal Reply 5 (defining the central issue as whether the claim arose out of liability under the contracts); Cousins Reply 4 ("the question is whether the claims would have arisen 'but for' alleged *liability under* the contracts")). They disagree, however, over the extent of that exclusion.

Cousins, on the other hand, argues that Exclusion (C)(2) is much more limited in scope and applies strictly to claims based on the contract, itself. Cousins also argues that Exclusion (C)(2) does not exclude its claims because—even if Exclusion (C)(2) were to otherwise apply—it "would have been liable in the absence of [its] contract or agreement" with the investors. (Cousins Br. in Supp. 12–15 (citing *Harker's Distribution, Inc. v. Federal Ins. Co.*, 2009 WL 3199533, at *5 (N.D. Iowa Sept. 30, 2009); *Foodtown, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2008 WL 3887617, at *5 (D.N.J. August 20, 2008), *aff'd*, 412 Fed. Appx. 502 (3d Cir. Jan. 6, 2011); *McPeek v. Travelers Cas. & Sur. Co.*, 2006 WL 1308087, at *3–*4 (W.D. Pa. May 10, 2006)). *See also* Cousins Resp. 3–11; Cousins Reply 4–9).

This is a close question, but the Court ultimately must agree with Federal. Many courts have considered this question or a variation thereof. *See, e.g.*, 2-25 LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 25.02 (Matthew Bender & Company, Inc. 2011) (citing many conflicting cases from both state and federal courts—*though no relevant cases from Wisconsin or any district in the Seventh Circuit*—interpreting exclusion clauses similar to Exclusion (C)(2)). Indeed, the exact language of Exclusion (C)(2) has been reviewed by at least three other federal district courts, which have not reached consistent decisions. *See, e.g.*, *KDW Restructuring & Liquidation Servs., LLC*, 2012 WL 3579840 (applying a "but for" test to determine whether liability flowed from the contracts in question); *Harker's Distribution, Inc.*, 2009 WL 3199533 (relying on the exception to Exclusion (C)(2), relating to liability in absence of contract, to find that Exception (C)(2) inapplicable); *Spirtas Co.*, 481 F. Supp. 2d 993, *aff'd* 521 F.3d 883 (treating the "arising from" language broadly, to determine that liability arose under a contract). But, ultimately, the Court believes the language speaks for itself: it excludes

Case 2:12-cv-00387-JPS   Filed 02/08/13   Page 12 of 34   Document 58

coverage for liability *under* a contract, meaning liability pursuant to the existence of a contract (in other words, liability that relies upon the existence of a contract). Exclusion (C)(2) does not limit itself to excluding liability for breach of contract or for liability under a theory of contract. Rather, Exclusion (C)(2) is much more broad, taking shape in a way much closer to the "but for" standard suggested by Federal.

KDW Restructuring provides the Court with the firmest guidance on the issue. There, the Court held that the language of Exclusion (C)(2) was unambiguous and excluded coverage for fraudulent inducement and negligent misrepresentation because those claims arose from the "same essential facts and circumstances" that supported separate breach of contract claims. *KDW Restructuring & Liquidation Servs., LLC*, 2012 WL 3579840, at *12. The *KDW Restructuring* court did point out that the relationship between the tort and contract claims was particularly close because misinformation was incorporated into the parties' contracts; the court did not, however, state that tortious misinformation *must* be included in a contract to find that tort liability arises under a contract. *Id.* And the Court does not believe that there should be any such requirement: so long as the liability rests upon the existence of a contract, Exclusion (C)(2) bars coverage for it.

*Harker's*, on the other hand, relied upon the exception to Exclusion (C)(2) to deny coverage, rather than examining the extent of Exclusion (C)(2), itself. *Harker's Distribution, Inc.*, 2009 WL 3199533, at *4–*5 (focusing almost exclusively on the language related to the insured's liability in the absence of a contract). Therefore, *Harker's* failing to address the question of Exclusion (C)(2)'s extent, the Court will not rely on it for guidance on how to answer the Court's first question, as noted above, relating to whether Exclusion

(C)(2) excludes the claimed liability. Rather, *Harker's* relates much more closely to the second question, to which the Court now turns.

*Second*, the Court must determine the extent to which Cousins "would have been liable in the absence" of its contracts with the investors for any otherwise excluded losses—as determined under the first question. *Harker's* relates to this question, in that it held that coverage was not excluded where the insured *could have* faced theories of liability that did not rely on the existence of a contract. *Harker's Distribution, Inc.*, 2009 WL 3199533, at *4–*5 ("Thus, the exception to the Contractual Liability Exclusion required Federal to consider whether McMillan could have asserted a claim against Harker's for its wrongful acts under a legal theory independent of any contract, and if so, whether Harker's would have been liable to McMillan under that theory."). The Court does not agree with the *Harker's* court's interpretation of the policy language. The language does not include or imply the phrase "could have." Rather, on the policy's plain language, it specifically provides that claims for liability under a contract are excluded, unless that liability *would have* existed in the absence of a contract. Furthermore, the Court finds that a "could have" standard would be far too nebulous—if the question were to be whether the insured could have faced non-contractual theories of liability, then Federal would be required to cover otherwise clearly excluded claims so long as the non-insured claimant could bring other, entirely unrelated, non-contractual claims against the insured. That is simply too broad. Therefore, the Court declines to follow *Harker's*, and instead will ask the question whether Cousins would have been liable in the absence of its contracts with the investors for any otherwise excluded losses.

Having set forth the two questions that the Court must ask of each unsettled claim, as well as the respective standards that apply to those

Case 2:12-cv-00387-JPS   Filed 02/08/13   Page 14 of 34   Document 58

questions, the Court now turns to applying its two-question test to each unsettled claim.

### 4.1.2   Application of Exclusion (C)(2)

As already described above, Judge Clevert declined to grant summary judgment on the following six of the investors' counterclaims:

(1)   intentional misrepresentation;

(2)   breach of two contracts between Cousins and the investors;

(3)   rescission of those contracts;

(4)   violation of the Wisconsin Franchise Investment Law, Wis. Stat. §§ 553.41(3–5) and 553.51;

(5)   violation of the Wisconsin Theft statute, Wis. Stat. §§ 943.20(1)(d), 895.446; and

(6)   violation of the Indiana Franchise Disclosure Act and Deceptive Trade Practices Act, In. Code §§ 23-2-2.5-1; 23-2-2.7-1(10); and 23-2-2.5-27, 28, 29, and 31.

*Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #94, at 10–27; (FF ¶¶ 47–50; Cousins Resp. FF ¶¶ 47–50).

The Court now applies its two-question test to each of those claims in order to determine whether Exclusion (C)(2) denies coverage to them. The Court notes that the two questions in the test it now applies are closely related. The first question seeks to determine whether the claimed violation can be said to trace to the existence of a contract; the second question, which the Court must answer only if it answers the first question in the affirmative, then seeks to engage the extent that Exclusion (C)(2) bars coverage of the claim, exempting from Exclusion (C)(2) any damages that would lie in the absence of a contract. There is some overlap between these questions, and it is likely that the two could be answered simultaneously without separating

the two inquiries from one another in application to each claim. Nonetheless, in the hope of being as thorough as possible, the Court will treat the two questions as separate, and answer both in evaluating the application of Exclusion (C)(2) to each claim.

#### 4.1.2.1 Intentional Misrepresentation

Under Wisconsin law, intentional misrepresentation requires: (1) the representation of fact; (2) that the representation was false; (3) that the damaged party believed truth of representation and relied thereon resulting in damage; (4) that the representation was made with knowledge of its falsity *or* with reckless disregard for its falsity; and (5) that the representation was made with intent to deceive and induce action. *Tietsworth v. Harley Davidson*, 270 Wis. 2d 146, 677 N.W. 2d 239 (2004).

*First,* given those elements of the claim, it is clear that the Exclusion (C)(2) applies to the intentional misrepresentation claim. Intentional misrepresentation requires reliance on a misrepresentation and damages resulting therefrom. Cousins' liability stemmed primarily from the contract it entered with the investors. Thus, its liability for the intentional misrepresentation claim is under a contract, and Exclusion (C)(2) applies to exclude it from coverage.

*Second*, however, a portion of Cousins' liability would have existed in the absence of its contract, and therefore Federal must cover Cousins' liability to the extent liability would exist in the absence of the contract. While it seems that Cousins' liability for intentional misrepresentation stemmed primarily from the contract it entered with the investors, it is likely that the investors relied upon and were damaged by those misrepresentations to some extent prior to entering the contract. For instance, before entering the contracts, the investors may have paid fees to financial

analysts, seeking advice on opening Cousins franchises; they may have incurred extensive travel expenses to meet with Cousins representatives. It is quite possible that they would not have incurred those expenses if Cousins had not intentionally misled them, regardless of having eventually entered into the contract. In other words, even if the investors had not contracted with Cousins, it certainly seems that they would have a claim against Cousins for intentional misrepresentation for damages incurred during some "string-along" period in which they relied on Cousins misrepresentation, expending money to evaluate the potential contract with Cousins. As such, that liability would exist in the absence of the contract between Cousins and the investors, and therefore Cousins' claim is not excluded to the extent that it relates thereto.

Unfortunately, there is not sufficient factual information at this juncture to determine the extent to which Cousins' liability would exist even in the absence of the contract. Accordingly, this is a matter that must be determined at trial.[9]

The Court notes, however, that this is a very limited issue for trial—it relates solely to the amount of damages incurred by the investors during the string-along period before the contract was entered into, and for which Cousins would have been liable in the absence of the contract.

### 4.1.2.2   Breach of Contracts

*First,* there can be no breach of contract without the existence of a contract, and accordingly any liability for breach of contract must be under

---

[9] Below, the Court discusses the issue of allocation of the settlement amount to individual claims and parties. The Court determines that there is not sufficient information at this juncture to determine whether the entire settlement should be allocated to the claims remaining after this summary judgment order. Therefore, the Court determines that this is an issue that must go to trial.

a contract. Accordingly, Exclusion (C)(2) applies to Cousins' breach of contract claims.

Second, unlike the intentional misrepresentation claim above, none of Cousins' damages for breach of contract could have existed in the absence of that contract. In fact, the damages under the contract rely fully on the existence of a contract.

Therefore, the Court holds that Cousins could not succeed on this claim at trial, and will accordingly dismiss it at this juncture.

### 4.1.2.3 Rescission of Contracts

First, under Wisconsin law, there can be rescission liability that is not "under" a contract. The Wisconsin Supreme Court has acknowledged that there can be damages under a claim of rescission—called rescissory or restorative damages—that "do not arise from a contract, but from a wrongful act such as fraud in the inducement" and are intended to compensate for past injuries due to a fraud (whereas the rescission, itself, is intended to protect future rights). *Wickenhauser v. Lehtinen*, 2007 WI 82 ¶ 17, n. 4, 302 Wis. 2d 41, 734 N.W.2d 855 (citing *Head & Seemann, Inc. v. Gregg*, 104 Wis.2d 156, 165–67, 311 N.W.2d 667 (Ct. App. 1981), *aff'd and adopted,* 107 Wis.2d 126, 127, 318 N.W.2d 381 (1982); *Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 985 (7th Cir. 1978), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179 (1978)). The actual rescission itself, of course, requires the existence of a contract to rescind. BLACK'S LAW DICTIONARY, Rescission (9th Ed. 2009).

Thus, the actual rescission of the contract between Cousins and the investors would fall under the contract; on the other hand, under Wisconsin law, the aforementioned rescissory damages do not arise from the contract, but instead from Cousins' wrongful act of fraudulent inducement. *See, e.g.*, *Wickenhauser*, 2007 WI 82 ¶ 17, n. 4. Accordingly, Exclusion (C)(2) would

apply to any damages stemming from the rescission itself (although the Court is not aware of any damages that would flow therefrom), whereas Exclusion (C)(2) would not apply to any rescissory damages.

In other words, in answering the first question, the Court must conclude that any liability for rescissory damages is not under the contract, and Federal is responsible for coverage of those rescissory damages.[10] There are not sufficient facts at this juncture to determine the portion of the $750,000 settlement that is attributable to the rescissory damages, and accordingly that is an issue best left for trial.[11]

### 4.1.2.4 Violation of Wisconsin Franchise Law

The investors brought claims against Cousins for violations of the Wisconsin Franchise Investment Law, pursuant to Wis. Stat. § 553.51(2), which provides for civil liability against entities that violate Wis. Stat. §§ 553.41(3), (4), or (5). *See Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #7, at ¶¶ 90–96.

*First,* the liability for this claim falls under the contract between Cousins and the investors. Wis. Stat. § 553.51(2) states that any person who

---

[10] Having answered the first question in the affirmative, the Court need not answer the second question with respect to the rescissory damages. However, with respect to any potential liability that would flow from the rescission (which the Court has already explained is likely non-existent), such liability falls directly under the contract. Thus, the entirety of any liability flowing from rescission, itself, is excluded from coverage by Exclusion (C)(2).

[11] As with the intentional misrepresentation damages discussed above, the Court is obliged to determine that the factual record is not sufficiently developed to determine the allocation of the settlement to the remaining claim, and therefore must view that issue remains for trial.

Case 2:12-cv-00387-JPS    Filed 02/08/13    Page 19 of 34    Document 58

violates Wis. Stat. §§ 553.41(3), (4), or (5),[12] shall be "liable for damages" to any person who relied upon misrepresentations or untrue statements in purchasing a franchise. Here, the liability rests upon the existence of misrepresentations that induced the investors to enter into a contract to purchase franchise rights. Cousins' liability under Wis. Stat. § 553.51(2) stems from the entry of the contract between it and the investors, and, accordingly, Exclusion (C)(2) applies to the investors' claim under that statute.

*Second,* turning to the extent that Exclusion (C)(2) bars coverage, because an award of damages is available under Wis. Stat. § 553.51(2) only when there has been a purchase of a franchise, the Court is obliged to conclude that Cousins would not have been liable for damages under that statute in the absence of a contract. Without a purchase contract, Cousins could not be liable to the investors under Wis. Stat. § 553.51(2).

Therefore, Exclusion (C)(2) applies to exclude coverage by Federal for any liability under Wis. Stat. § 553.51(2). Cousins cannot succeed in arguing that Federal should cover any portions of the settlement that are attributable to Wis. Stat. § 553.51(2), and therefore that portion of Cousins' claim is appropriately dismissed at this juncture.

### 4.1.2.5   Violation of Wisconsin Theft Statute

*First,* the Court concludes that Exclusion (C)(2) applies to the investors' claim against Cousins for a violation of Wisconsin's civil theft statute, Wis. Stat. § 895.446. To find civil liability for theft, a court must first find the existence of a theft under Wis. Stat. § 943.20(1)(d). Under that statute,

---

[12] These three statutory sections prohibit fraudulent practices such as making untrue statements of material fact or representing that the state of Wisconsin passed upon the merits of a franchise. *See, e.g.,* Wis. Stat. §§ 553.41(3), (4), and (5).

a theft occurs when one "[o]btain[s] title to property of another person" through intentional deception or false representation. Wis. Stat. § 943.20(1)(d). Here, Cousins could not have obtained title to any property of the investors without the existence of a contract.[13] It was only when Cousins entered into the contracts with the investors that Cousins was entitled to and received any funds from the investors. Accordingly, liability falls under a contract, as a violation of Wis. Stat. § 943.20(1)(d) rests upon the existence of a contract in this case. Therefore, Exclusion (C)(2) applies to the investors' theft claim against Cousins.

*Second,* Exclusion (C)(2) applies to bar the full extent of Cousins' liability under Wis. Stat. § 895.446. The investors did not make any claims that would lead the Court to believe that Cousins had obtained any title to the investors' money or property outside of those moneys received under the contract between them. *See Cousins Subs Systems*, No. 09-CV-336-CNC, Docket #7, at ¶¶ 90–96. For example, even if the investors had expended funds during the "string-along" period to evaluate their investment, Cousins never actually received title to any of those funds (which would have, instead, been paid for travel expenses or to financial advisors, etc.). Accordingly, Cousins could not be liable for any of those expenses under the theft statute. *See* Wis. Stat. § 943.20(1)(d). Thus, in the absence of the contract, Cousins would not be liable to the investors for any amounts.

Therefore, Exclusion (C)(2) applies to exclude the entirety of any liability Cousins faced under the Wis. Stat. § 895.446. At trial, Cousins could

---

[13] Presumably, the investors would have claimed at trial that Cousins obtained title to the investors' money. There is no indication that the investors provided any money to Cousins prior to the formation of the contract, nor can the Court envision any reason that Cousins would have obtained title to any funds or property of the investors in the absence of that contract.

not succeed in claiming that Federal should be responsible for any portion of the settlement attributable thereto, and therefore the Court will dismiss that portion of Cousins' claim against Federal seeking reimbursement for the settlement amounts that flowed from liability under Wis. Stat. § 895.446.

### 4.1.2.6 Violation of Indiana Franchise Laws

Finally, the Court turns to the investors' claims against Cousins for violations of the Indiana Franchise Disclosure Act and Deceptive Trade Practices Act, In. Code §§ 23-2-2.5-1, *et seq,* and 23-2-2.7-1, *et seq.* Under those laws, entities may be liable for damages incurred as a result of material misrepresentations made "in connection with the offer, sale or purchase of any franchise." In. Code §§ 23-2-2.5-27, 23-2-2.5-28. *See also Carrel v. George Weston Bakeries Distribution, Inc.,* No. 1:05-CV-1769, 2007 WL 2827405 (S.D. Ind. Sept. 25, 2007) (citing *Enservco, Inc. v. Indiana Securities Div.,* 623 N.E.2d 416, 423 (Ind.1993)).

*First,* turning to the application of Exclusion (C)(2) to the investors' Indiana law claim, the Court finds that such claim arises under the contract between Cousins and the investors. Liability is imposed under the relevant Indiana law when there are misrepresentations made "in connection with the offer, sale or purchase of any franchise." Here, any misrepresentations made were made during the offer, sale, and purchase of the Cousins franchise rights—all of which form a portion of the formation of the contract between Cousins and the investors. Accordingly, any liability for those misrepresentations is under the contract.

*Second,* however, a portion of that claim would exist even in the absence of the contract between Cousins and the investors, and accordingly Exclusion (C)(2) does not bar coverage for the entirety of the portion of settlement attributable to the Indiana law claim. The relevant Indiana laws

provide for liability for any misrepresentations made in connection with, among other things, the offer for sale of a franchise. Therefore, much like with the intentional misrepresentation claim above, Cousins was liable—even in the absence of a contract—for any amounts expended by the investors during the offer period (which the Court previously called the "string-along" period) prior to the actual formation of the contract. Cousins would have been liable for those amounts, likely paid to third parties in the form of investment research fees, travel costs, and other items necessary before the formation of the contract, even if it had never formed the final contract with the investors. Accordingly, Exclusion (C)(2) does not apply to that portion of the settlement attributable to the pre-contract damages suffered by the investors in the absence of the contract.

Much like with the intentional misrepresentation claim, the actual dollar amount of the portion of settlement attributable to the pre-contract damages under the Indiana law claims remains an issue for trial.[14]

### 4.2     Exclusion (C)(8)

Having applied Exclusion (C)(2) to each of the remaining counterclaims for which Cousins settled with the investors, the Court now turns to application of Exclusion (C)(8). The Court must apply Exclusion (C)(8) to determine whether it bars coverage of any of the claims to which the Court found Exclusion (C)(2) inapplicable.

This is a much easier question than that posed by Exclusion (C)(2). Here, the Court determines that Exclusion (C)(8) does not apply to any of the

---

[14] Just as with the intentional misrepresentation claims, the Court is obliged to determine that the factual record is not developed enough at this point to make the final allocation determination. Therefore, the Court views that issue as one for trial.

claims asserted by the investors against Cousins for which Cousins offered the $750,000 settlement.

Exclusion (C)(8) provides that there is no coverage available for any claim

> based upon, arising from, or in consequence of allegations of price fixing, restraint of trade, monopolization, unfair trade practices or any actual or alleged violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world.

(Policy, Directors & Officers Liability Coverage Section, at 8, subpt. III.C.2).

Federal argues that the term "unfair trade practices" applies to Cousins' misrepresentations, such that all of the claims against Cousins are barred by Exclusion (C)(8).

The Court disagrees. To begin, the plain language of Exclusion (C)(8) makes fairly clear that the Exclusion is meant to apply only to activities related to anti-trust, price fixing, and other similar forms of business misconduct. It is not a broad exclusion meant to gather in all otherwise-non-excluded bad acts of a business, as Federal seems to assert. Moreover, even if the Court were to determine that the phrase "unfair trade practices" were ambiguous, as used in Exclusion (C)(8), the Court would still find that the phrase is not nearly as broad as suggested by Federal. When the phrases in an insurance policy are ambiguous, the Court should apply rules of construction to the policy's phrases to interpret them, and will typically construe exclusions in favor of the insured and against the insurer. *See, e.g.*,

*Folkman*, 2003 WI 116, ¶ 13; *Atlantic Mut. Ins. Co.*, 155 Wis. 2d at 811, 456 N.W.2d 597; *Kaun*, 148 Wis. 2d at 669, 436 N.W.2d 321. Under the rule of *ejusdem generis* (and the related rule of *noscitur a sociis*), the Court must limit the term "unfair trade practices" to the same class of terms set forth in Exclusion (C)(8). *See, e.g.*, *Wisconsin Builders, Inc. v. General Ins. Co. of America*, 65 Wis. 2d 91, 101, 221 N.W.2d 832 (1974); *State v. Campbell*, 102 Wis. 2d 243, 246–247, 306 N.W.2d 272 (1981); *State v. Popenhagen*, 2008 WI 55, ¶¶ 47–48 and n. 25, 309 Wis. 2d 601, 749 N.W.2d 611 (citing *State v. Engler*, 80 Wis. 2d 402, 408, 259 N.W.2d 97 (1977); 2A Norman J. Singer & J.D. Shambi Singer, STATUTES AND STATUTORY CONSTRUCTION (7th ed. 2007) § 47:17, at 357–80; *State v. Peters,* 2003 WI 88, ¶¶ 16–23, 25, 27–34, 263 Wis.2d 475, 665 N.W.2d 171; *State v. Campbell,* 102 Wis.2d 243, 246–47, 306 N.W.2d 272 (Ct. App. 1981); *Wis. Citizens Concerned for Cranes & Doves,* 2004 WI ¶ 40, 270 Wis.2d 318, 677 N.W.2d 612).

Applying that rule to the phrase "unfair trade practices," particularly in consideration of the fact that the Court must construe the phrase in favor of Cousins, the Court is obliged to determine that "unfair trade practices" includes only actions related to anti-trust, monopoly, price fixing, and other similar violations. It certainly does not reach so far as to gather in bad acts that flow from misrepresentations. The phrase appears in a list of statutes and general violations that relate practically exclusively to price fixing, monopoly, and anti-trust violations. There is no indication that Exclusion (C)(8) is meant to apply more broadly than that. Rather, any reasonable insured reading the policy would believe that Exclusion (C)(8) was meant to exclude only violations arising from price fixing, monopoly, anti-trust, and the like.

When taken in consideration with the Court's obligation to construe the phrase in favor of Cousins and against exclusion, the Court is obliged to determine that Exclusion (C)(8) is not nearly as broad as asserted by Federal, and does not operate to exclude any of the investors' claims against Cousins, which were all based upon Cousins' alleged misrepresentations.

### 4.3    Bad Faith Analysis

Federal requests that the Court grant summary judgment on Cousins' bad faith claim, dismissing the claim. The Court agrees with Federal that dismissal at the summary judgment stage is appropriate.

Under Wisconsin law, an insured, such as Cousins, must satisfy a two-prong test to establish bad faith against an insurer, such as Federal. *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 49, 334 Wis. 2d 23, 798 N.W.2d 467. First, Cousins must establish that there is no objectively reasonable basis for Federal to have denied Cousins' claim for benefits. *Id.* That standard cannot be satisfied if the basis for denying the claim was fairly debatable. *Trinity Evangelical Lutheran Church and School—Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 33, 261 Wis. 2d 333, 661 N.W.2d 789. Second, Cousins must show that, subjectively, Federal knew or should have known that there was no reasonable basis to deny the claim. *Brethorst*, 2011 WI 41, at ¶ 49.

Cousins cannot show either prong. As to the first, the Court has already provided an extensive discussion of the merits of Federal's denial of coverage, concluding that such denial was proper as to many of the claims settled by Cousins. Each portion of the Court's discussion of Exclusion (C)(2) was a very close matter, often requiring the Court to parse out portions of the claims for coverage while dismissing other portions. In other words, the coverage determination was—at the very least—fairly debatable. Moreover, as to the second prong, a number of non-Wisconsin cases affirmed Federal's

interpretation of its policy, supporting Federal's subjective belief that it was reasonable to deny Cousins' claim. *See, e.g.*, *KDW Restructuring & Liquidation Servs., LLC*, 2012 WL 3579840; *Spirtas Co.*, 481 F. Supp. 2d 993. While it is true that a separate case held Federal's interpretation to be in error, *Harker's Distribution, Inc.*, 2009 WL 3199533, that case is no more persuasive in this jurisdiction than the two cases supporting Federal's interpretation. Giving that case the maximum appropriate weight, it does little more than make the Exclusion (C)(2) coverage issue fairly debatable, and Cousins still cannot satisfy the first prong.[15]

For these reasons, the Court is obliged to conclude that Cousins cannot establish bad faith on the part of Federal, and will,, therefore, grant Federal's motion for summary judgment on the issue of bad faith.

Related to this issue is the submission of Mr. Daniel Doucette, who Cousins names as an expert witness to support its bad faith claim. To begin, given the Court's previous discussion granting Federal's motion for summary judgment on the issue of bad faith, neither the Court nor the jury need to consult Mr. Doucette's opinion; therefore, admission of his testimony is moot and the Court will accordingly deny Federal's motion to exclude his

---

[15] While the Court does not find that Federal's defense of its exclusion was in bad faith, it warns that Federal seems to need to examine Exclusion (C)(2) very closely—it is, at best, poorly drafted. It is indicative that four courts (including this one) have now reviewed the language without reaching a firm consensus on what it actually means. *See, e.g.*, *KDW Restructuring & Liquidation Servs., LLC*, 2012 WL 3579840; *Harker's Distribution, Inc.*, 2009 WL 3199533; *Spirtas Co.*, 481 F. Supp. 2d 993. Granted, state law is proprietary in each jurisdiction, affecting each court's analysis. But that does not change the fact that the language is rather confusing and difficult to apply. In cases like the one at hand, where a third-party litigant brought a significant number of claims against an insured, it is not easy work for a court to parse through each claim to determine coverage—and that task is complicated by the fact that the language of Exclusion (C)(2) is confusing in its own right.

Case 2:12-cv-00387-JPS   Filed 02/08/13   Page 27 of 34   Document 58

opinion (Docket #46) as such. Moreover, Mr. Doucette's opinion on the issue is of little help to the Court, as that opinion is primarily legal. Given Mr. Doucette's impressive legal experience, the Court does not doubt that Mr. Doucette is well qualified to provide an opinion on issues of coverage. But the Court agrees with Federal that his opinion is on purely legal issues and provides his subjective legal conclusions. (Br. Supp. Mot. Excl. Doucette 4–5 (citing *Connell v. Steel Prods. Ltd.*, 2009 WL 691292, at \*9 (N.D. Ill. 2009); *Bammerlin v. Navistar Intern. Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994); *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009); *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007); *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. 2010); *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *Klaczak v. Consol. Med. Trans.*, 458 F. Supp. 2d 622, 636 (N.D. Ill. 2006); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 716 F. Supp. 2d 801, 806 (W.D. Wis. 2010))). The Court is perfectly able to analyze the law applicable to the claims in this case and the underlying claims in the prior action; it does not need a separate expert providing what is essentially a separate legal brief to make its legal determinations, here. However, the Court having decided the bad faith issue without the assistance of Mr. Doucette's brief, and the Court granting

summary judgment to Federal on that issue, the Court will deny Federal's motion to exclude Mr. Doucette's opinion (Docket #46) as moot.[16]

### 4.4    Allocation

The final issue that the Court must decide is that of allocation. On this issue, Cousins argues that Federal has failed to establish that the $750,000 settlement award should be allocated between covered claims and non-covered claims. (*See, e.g.*, Cousins Resp. 19–21). In other words, Cousins argues that the Court should treat the entire $750,000 settlement as arising from the covered claims, and therefore hold Federal responsible for the full amount. Federal disagrees, asserting that the settlement liability should be allocated between covered and non-covered claims. (*See, e.g.*, Federal Br. in Supp. 19–21). Federal also argues that a portion of the settlement should be attributed to a group of uninsured individuals known as the Morello parties, who acted as selling agents for the franchise contracts and against whom the investors had brought counterclaims; Cousins' settlement dispensed with those counterclaims. (*See, e.g.*, Federal Br. in Supp. 19–21).

In connection with its arguments against, Cousins has submitted the affidavit of Frederic Cohen, a lawyer who represented Cousins in the prior action, and who offers his beliefs as to the reasons Cousins settled the prior

---

[16] The Court is aware that some briefing on this issue has not yet been completed. The Court, however, believes that this issue can be appropriately resolved on the current state of briefing. Were the Court to wait out the entire briefing schedule, it would be necessary to delay issuance of this opinion until the eve of trial. The Court prefers to issue this opinion as expeditiously as possible, in order to give the parties an ample opportunity to prepare for the relevant issues at trial. With all of this said, if there remains some dispute on the issue of Mr. Doucette's testimony, the parties may file expedited motions *in limine* on that issue prior to trial.

action. (Docket #44). Federal has filed a motion to strike that affidavit as offering improper expert testimony. (Docket #50).

Addressing the issue of Mr. Cohen's affidavit first, the Court determines that it would be improper to strike the affidavit. While Federal asserts that Mr. Cohen's affidavit is actually a submitted expert report (Docket #51), the Court disagrees. Mr. Cohen is better classified as a fact witness. Granted, there is a very thin line between the testimony provided by Mr. Cohen and that offered by Mr. Doucette: both witnesses' testimony relies on subjective legal conclusions. Mr. Cohen's testimony, however, derives from his position as attorney in the prior action. At that time, he was able to gather impressions about the prior action. He now offers testimony regarding the conclusions he reached at that time. To the Court, this seems to be much closer to a fact witness than to an individual offered as an expert. At trial, if Mr. Cohen is to testify, the jury will be able to gauge the credibility of his statements. For these reasons, the Court will deny Federal's motion to strike Mr. Cohen's affidavit (Docket #50).[17]

On the actual issue of allocation, the Court determines that summary judgment would be premature at this time. The policy provides that all losses other than defense costs are to be "allocated between covered loss and uncovered loss based upon the relative legal exposures of the parties to such matters." (Policy, General Terms and Conditions Section, at 10, subpt. X.2). Therefore, allocation of the settlement amount between the covered and uncovered claims is appropriate under the policy.

---

[17] Again, the Court notes that this issue was not fully briefed. The Court, however, believes that it is able to decide the issue on the current state of the briefs, in order to issue this decision as quickly as possible. If the parties—Federal, in particular, on this issue—disagree with the Court's assessment, they may file expedited motions *in limine* on the issue prior to trial.

The ultimate allocation of the settlement amount is an issue for trial. While it is Federal's burden to establish the proper allocation, *see, e.g., American Motorists Ins. Co. v. Trane Co.*, 544 F. Supp. 669, 690 (W.D. Wis.), there is sufficient factual material at this time to raise a question of fact as to what the settlement covered. On Cousins' side is the affidavit of Mr. Cohen, in which he asserts that the partially-covered misrepresentation claims—the intentional misrepresentation, Wisconsin franchise law, Wisconsin theft law, and Indiana franchise law claims—were the crux of the settlement compared to the relatively unimportant contract claims. But, even if the Court were to accept his assertion at face value, there is further apportionment that must be done between the misrepresentation-based claims—all of which the Court has determined are either not covered or only partially covered. Moreover, given that the Court has found that rescissory damages are not excluded by Exclusion (C)(2), there is additional allocation that must be performed for that claim.

Given this state of the record, the allocation issue must proceed to trial. The policy makes clear that any loss—here, the settlement—must be allocated between covered and uncovered loss. There were many claims upon which the settlement in this case was based, some of which were covered and some of which were not, as already determined by the Court. The amount appropriately allocable to any claim, though, is an issue for trial. At that time, Federal will be put to their burden to show how the settlement should be allocated between covered and uncovered claims.

Finally, the Court also finds that the last allocation issue, relating to the Morello parties, is one for trial. Federal argues that the Morello parties are not insured under the contract, and therefore any portion of the settlement attributable to their liability should be excluded from the amount

Federal must cover. (Federal Reply 11). Rather than arguing that the Morello parties were, in fact, insured under the policy, Cousins instead argues that Cousins would likely have been liable for any amount awarded against the Morello parties. (Cousins Resp. 20–21). From the state of the facts and the briefs of the parties, the Court may conclude that the Morello parties were not insured under the contract (*see e.g.*, Cousins Resp. 20–21; Federal Reply 14; Cohen Aff. ¶ 5; FF ¶ 58 and Cousins Resp. FF ¶ 58). Accordingly, any settlement amounts made to satisfy the Morello parties' liability, alone, are not covered by the policy. But that does not put the issue to rest entirely. This is ultimately an issue of fact for trial, as a factfinder must determine which portion of the settlement should be attributed to the Morello parties' uncovered liability and which portion to Cousins' covered liability.

For all of these reasons, the Court is obliged to conclude that the issue of allocation should proceed to trial. At trial, the jury will be responsible for making a factual determination of what portion of the settlement should be allocated to the covered portions of the investors' claims against Cousins. Federal shall be responsible for paying only those covered portions.[18]

5.    CONCLUSION

In sum, here is the gist of what the Court has decided: Federal has responsibility to cover some of the settlement payed by Cousins to the investors. It is not, however, responsible to cover any portion of settlement attributable to the breach of contract, Wisconsin Franchise Invest Law, or theft claims; nor is Federal required to cover any portion of the settlement

_____

[18] Here, the Court must note that Cousins' claims will be limited to the remaining amount of available coverage under the policy's Limit of Liability. Because Federal paid Cousins' defense costs in the prior action, the total available $1,000,000 coverage limit has been reduced to $672,380.39. (FF ¶ 79; Cousins Resp. FF ¶ 79; SF ¶ 5).

attributable to contract-based liability under the intentional misrepresentation, rescission, or Indiana Franchise Disclosure Act and Deceptive Trade Practices Act claims. Federal is, however, responsible to cover the portion of settlement attributable to pre-contract damages for the intentional misrepresentation and Indiana Franchise Disclosure Act and Deceptive Trade Practices Act claims, as well as the rescissory damages portion of the rescission claim.

The general question that remains for a jury is one of allocation: to what extent did Cousins' settlement with the investors satisfy those latter claims, for which Exclusion (C)(2) does not bar coverage. As mentioned above, this is a very limited question—made only more limited by the fact that the Court has already determined that Cousins' bad faith contentions cannot survive to a jury.

Accordingly,

IT IS ORDERED that Cousins' motion for summary judgment (Docket #30) be and the same is hereby GRANTED in part, to the extent the Court has found that certain of its claims are not excluded from coverage under the policy, and DENIED in part;

IT IS FURTHER ORDERED that Federal's motion for summary judgment (Docket #22) be and the same is hereby GRANTED in part, as relating to the issue of bad faith and to the extent the Court has found that certain of Cousins' claims are excluded from coverage under the policy, and DENIED in part;

IT IS FURTHER ORDERED that Federal's motion to exclude the opinion of Daniel Doucette (Docket #46) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that Federal's motion to strike the affidavit of Frederic Cohen (Docket #50) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge